37 C.C.P.A. (Patents)

### Application of REID.
### Patent Appeals No. 5647.

United States Court of Customs and Patent Appeals.

Argued Nov. 8, 1949.

Decided Feb. 2, 1950.

Willard L. Pollard, Jr., Akron, Ohio (Charles M. Thomas, Washington, D. C., and Bernard C. Frye, Akron, Ohio, of counsel), for appellant.

E. L. Reynolds, Washington, D. C., for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

JACKSON, Judge.

Appellant appealed from a decision of the Board of Appeals of the United States Patent Office, affirming that of the Primary Examiner, finally rejecting all of the claims of an application, serial No. 594,797, filed May 19, 1945, for Improvements in Manufacture of Films. The involved claims are numbered 1 to 9, inclusive, all of which are directed to a process of producing a transparent flexible self-sustaining wrapping film. Claims 2 and 4 were rejected as being drawn to a nonelected species. The other claims were rejected as unpatentable over the prior art: Groves (British), 437,-604, October 28, 1935; Haux, 2,046,378, July 7, 1936; Henderson, 2,330,353, September 28, 1943.

Counsel for appellant in their brief state that claim 1 is the broadest of the involved claims, and a determination of its patentability will apply to all the rejected claims.

Claim 1 reads as follows:

"1. Process for producing a transparent, flexible, self-sustaining wrapping film, which comprises casting upon a support a film of a mixed latex containing dispersed therein (1) a resin selected from the group consisting of polymers and copolymers of vinyl chloride and (2) from about 50% to about 300%, based on the weight of said resin, of a copolymer of the ingredients

The process of the involved claims is apparent in the quoted claim.

The British patent to Groves relates to the manufacture of sheets or foils from polymerization products. The articles are produced by the use of polymers or copolymers, including a polymer of vinyl chloride and acrylic acid. The polymer is in the form of a suspension which may be "the emulsions frequently formed in the production of the polymerized product." The emulsion may be concentrated by evaporation or by adding powered product, "or its viscosity may be increased by some other colloido-chemical process so that it becomes fit to form the desired layer." It is stated in the specification that in the process of the patent "the polymerization product is brought into the form of a homogeneous aqueous suspension adapted to be spread in a uniform layer." When such layer has been produced, the liquid in the paste, generally water, is evaporated and the temperature raised above the softening point of the polymerization product, which results in the coalescence of the polymerization material by the aforesaid heating and subjecting it to high pressure.

The patent to Haux relates to a method for plasticizing a synthetic resin, forming it into a transparent sheet, usable, among other purposes, as the interlayer in safety

$$
\text{H}\atop\text{CH}_3 \Big\}\!\!-\!\!-\!\!-\!\!
\overset{\overbrace{\text{H CH}_3}}{\underset{\underbrace{\text{H Cl CH}_3}}{\text{C}}} \!\!-\!\!-\!\!
\underset{\underbrace{\text{H CH}_3}}{\text{C}} \!\!-\!\!-\!\!
\text{C} =\!\!=\!\! \overset{\overbrace{\text{H CH}_3}}{\text{C}} \!\!-\!\!-\!\!
\Big\{\!\!{\text{H}\atop\text{CH}_3} \qquad \ldots 10 \text{ to } 90 \text{ parts by weight}
$$

and

$$
\underset{\underbrace{\text{H \quad Cl \quad C}_2\text{H}_5 \quad \text{C}_3\text{H}_7}}{\text{CH}_2 =\!\!=\!\! \text{C} \!\!-\!\!-\!\! \text{CN}} \;\ldots\ldots\; 90 \text{ to } 10 \text{ parts by weight}
$$

in which formulae each bracket indicates attachment of a substitent [sic] chosen from the group of substituents embraced thereby, drying said film upon said support, heating said film to from about 275° to 350°F., cooling said film, and stripping said film from said support."

glass. The patent discloses a method of forming such sheets in which an aqueous suspension of polyvinyl acetal or polyvinyl chloride acetate is deposited on a screen as a layer. The layer, which is dried by pressing and heating, forms the transparent sheet.

The Henderson patent relates to a mixture of polymerized materials and discloses a method of forming a composition comprising a mixture of polyvinyl chloride with a butadiene-acrylic nitrile copolymer. The polyvinyl chloride may be commingled by milling it with the copolymer until a homogeneous mass is obtained. The mixture is tough, strong, resilient, and resistant, forming a clear homogeneous film when stretched. The product is brought into final shape by extruding, molding, calendering and the like, and subsequently vulcanized.

Both of the tribunals of the Patent Office rejected all of the claims except those drawn to the nonelected species on the Haux or the British patent in view of the patent of Henderson, so that if one or the other rejection should be deemed proper by us, the decision of the board must be affirmed.

It may be noted that the process steps set out in claim 1 are as follows: the casting of a material on a support; drying the film on the support; heating the film to from about 275° to about 350°F.; cooling the film; and stripping it from the support. It is clear that the British patent discloses the casting of a material on a support; drying the film on the support; and heating the film at a temperature of 80° to 150° C., which is the equivalent of 176° to 302°F. The temperatures recited in the patent, therefore, overlap the range defined by claim 1, thus satisfying the temperature requirement of the claim. The steps of cooling and stripping the film are certainly implied in the process of the patent because the material there is heated to a temperature above the softening point, and obviously could not be stripped from the support until it had cooled.

We find nothing in the appealed claims which would preclude the use of the pressing limitation disclosed in the process of the British patent. Those claims contain the broad statement that the process "comprises" the steps, and therefore may not be held to exclude the use of additional steps to those set out in the claims. In re Horvitz, 168 F.2d 522, 35 C.C.P.A., Patents, 1239, 1244; In re Lincoln et al., 150 F.2d 576, 32 C.C.P.A., Patents, 1213, 1216; In re Cone, 121 F.2d 470, 28 C.C.P.A., Patents, 1282.

In view of what we have hereinbefore stated, it is clear that the rejected claims distinguish from the process of the British patent only in the specific material that is used.

It is stated in the decision of the board that counsel for appellant did not seriously contend that the patent to Henderson does not anticipate the compositions set out in the involved claims. Apparently, as appears in that decision, counsel for appellant argued that the milling together of the components in the Henderson patent will not produce a clear homogeneous transparent film.

In their brief and oral argument before us, it is contended by counsel for appellant that the essence of the alleged invention resides in the form of the starting material, which is of mixed latices of specifically defined components, thus differing from the material of the Henderson patent. Counsel argue that neither the Haux nor Henderson patent discloses or suggests a process using a latex in any form.

With respect to the Henderson patent, counsel for appellant contend that the disclosure therein is merely for a mill mixing of solid vinyl chloride resin with solid butadiene acrylonitrile copolymer rubber, whereby those materials are fully blended so as to be adapted for vulcanized insulation or the like. It is vigorously urged that it was novel to discover that such components could be brought into the form of mixed latices, the property of which produces novel results.

It is conceded in the brief for appellant that in the Henderson patent may be found the suggestion that the powdered components set out therein will form a "clear homogeneous film when stretched," but it is argued that nowhere in the patent is it stated that the film is transparent.

It is stated in appellant's brief that the invention of the British patent comprises suspending the powered resin in water, and, as so suspended, to spread it on a polished metal plate for water evaporation.

Counsel then point out that in the British patent it is necessary to use pressure on the material to form a transparent film, and that such pressing stage is essential, but that by the use of appellant's mixed latices, the pressing step is eliminated. We have already disposed of the contention of appellant concerning the step of pressing, and therefore it is unnecessary to discuss it further.

With respect to the statement in the Henderson patent that suspension may be derived from the emulsion frequently formed by the production of the polymerized product, counsel for appellant argue that from the context of the patent it is clear that the word "emulsions" is used synonymously with the word "suspensions."

As has already been observed, the board stated that counsel for appellent did not seriously contend that the Henderson patent does not anticipate the composition set out in the involved claims, and that statement has neither been challenged nor assigned as error in appellant's reasons of appeal. The principal contention of counsel for appellant here is that the references do not suggest the use of the starting materials in the form of latex.

For the reason that we must consider that the Henderson patent anticipates the composition recited in the involved claims, there remains for consideration the question as to whether or not the process of the British patent teaches or suggests the use of a latex or its equivalent.

Appellant uses the terms to signify artificial or synthetic preparations. It certainly follows that whatever meaning appellant had in mind when he used the word, since it does not correspond to the definition of natural latex, such meaning should have been set out in his application. There is nothing there to indicate, as stated in the brief of appellant, that the latices of the application are "colloidal dispersions with extremely minute particles of vinyl chloride resin or butadiene-acrylonitrile copolymer rubber as the case may be of the order of less than one micron in diameter or ultra microscopic in size."

That there are definitions of the term "latex," which include artificial preparations, is conceded by the solicitor. Appellant has called to our attention the following publications: *Concise Chemical and Technical Dictionary,* Chemical Publishing Co. (1947); *Van Nostrand's Scientific Encyclopedia,* 2d Ed., Van Nostrand Co. (1947); *The Condensed Chemical Dictionary,* 3d Ed., Reinhold Publishing Co. (1942); and *The Chemistry of Synthetic Resins,* Carleton Ellis, Vol. II, Reinhold Publishing Co. (1935). In those publications and others which we have had occasion to consult, including *Modern Rubber Chemistry* by Barron, published by D. Van Nostrand Company, Inc., we do not find any definition limiting the term to any particular degree of fineness, and therefore we conclude that the bare use of the term "latex" is not limited to a stable dispersion or to one of any particular degree of fineness.

Counsel for appellant vigorously contend that the sentence appearing in the decision of the board, "A 'latex' is described as colloidal dispersion of the components in an aqueous medium, and simulating the latex of natural rubber", was an "unequivocal finding by the Board, doubtless based upon appellant's disclosure and perhaps upon other scientific definitions of the word or data with which the Board was familiar."

Clearly appellant's disclosure contains no basis for such an alleged unequivocal finding. The board did not point out where the description was found nor whether it was considered accurate. In the reply memorandum of the solicitor filed in answer to a reply memorandum by counsel for appellant, our attention was directed to the fact that the description of the latex appears in a footnote to a brief filed on behalf of appellant and appearing in the record hereof. Seemingly the board quoted in effect that definition. That in our opinion does not constitute the unequivocal finding alleged by counsel for appellant. Even had the board made such express holding, if it were contrary to fact it would not be controlling here. In re

1002

Lewenstein, 165 F.2d 458, 35 C.C.P.A., Patents, 825.

It is stated in appellant's specification that the latices "may be any stable dispersions of vinyl resins." It seems to us that such dispersions, whether colloidal or not, are contemplated as coming within the scope of the invention, and it also would indicate that the term "latex" is broad enough to include unstable dispersions. Otherwise stable dispersions would not be mentioned, unless in the opinion of appellant there were such preparations which were not stable.

It may be here pointed out that according to the British patent the suspensions used may consist of emulsions produced in the making of the polymerized product. "Emulsion" is defined in *Hackh's Chemical Dictionary,* Third Edition, as consisting of "a microscopically heterogeneous mixture of two phases." Therefore, according to that definition, the particles would be of fine size. We think that the Primary Examiner was correct in stating that the suspensions mentioned in the British patent "may be formed by the polymerization of an emulsion of the monomer and thus may be a 'latex' wherein the polymer particles are of colloidal dimensions."

We cannot not agree that there is a vital distinction between the "homogeneous aqueous suspensions" of the British patent and the "stable dispersions" mentioned in the involved application, as contended by counsel for appellant. Hackh defines "suspension" as being the same as "suspensoid." The latter term is defined as "A mixture of finely divided, colloidal particles in a liquid—the particles are so small that they do not settle but are kept in motion by the motion molecules of the liquid (Brownian motion)." Therefore, it appears to us that the material set out in the British patent may be in the form of "Latex." In any event, the term as used by appellant has not been clearly enough defined to present a patentable distinction between the form of his material and that of the British reference. It is our opinion that invention would not be involved in using the material of the Henderson patent in the British process, and that such use would entirely fill the requirements of the claims on appeal, and be obvious to one skilled in the art.

Several affidavits made by employees of The Firestone Tire and Rubber Company, assignee of the involved application, were filed herein, and we agree with the statement of the solicitor in his brief that those affidavits set out opinions as to what the references disclose and the reports of experiments said to show that the disclosure of those patents produce inoperative or unsatisfactory results.

We do not deem it necessary to discuss the matters set out in the affidavits. The opinion portions thereof are inadmissible. In re Voit, 152 F.2d 987, 990, 33 C.C.P.A., Patents, 737, 742; In re Pierce, 35 F.2d 781, 17 C.C.P.A., Patents, 626; In re Garrett, 27 App.D.C. 19. As to the experiments, it is sufficient to state that the comparative superiority of appellant's process over the references considered alone can not be controlling. It may further be observed, but in no way reflecting on the good faith of the makers of the affidavits that " * * * the failures of experimenters who have no interest in succeeding should not be accorded great weight," as was stated in the case of In re Michalek, 162 F.2d 229, 232, 34 C.C.P.A., Patents, 1124. Therefore, we do not think that the affidavits herein should be considered as having much weight.

For the reason hereinbefore set out, the decision of the Board of Appeals is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.