50 CCPA
**Application of John B. DWYER, Joseph W. Jewell, William B. Johnson, Henry G. McGrath and Louis C. Rubin.**

Patent Appeal No. 6957.

United States Court of Customs and Patent Appeals.

May 16, 1963.

G. H. Palmer, Cincinnati, Ohio (John C. Quinlan, New York City, Max Dressler, James W. Clement and Ernest Cheslow, Chicago, Ill., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

This is an appeal from the decision of the Board of Appeals affirming the examiner's rejection of claims 1 through 8 in appellants' application [1] entitled "Reforming of Gaseous Hydrocarbons" as unpatentable over the prior art.

The application discloses a process for converting normally gaseous hydrocarbons such as methane or natural gas with steam and/or carbon dioxide to produce hydrogen and carbon monoxide. Appellants concede that process, referred to as hydrocarbon reforming, to be old. They say, however, that it has been the desire of the art to achieve reforming at higher pressures and higher space velocities [2] while maintaining an acceptable percentage of conversion, alleging that such procedure results in the following advantages:

" * * * Higher space velocities are desirable because it means a higher conversion to hydrogen and carbon monoxide per pound of metal tubing in the furnace thus decreasing the very high cost of the furnace. It is further desirable to increase both the pressure and space velocity in order to increase the capacity of the furnace and thus reduce required catalyst inventory. Pressure operations are particularly advantageous as the higher space velocities and much greater endothermic heat of reaction per tube results in greater heat transfer per unit tube surface area without any increase in metal temperature. Pressure operations also decrease the cost of subsequent compression, such as when using the hydrogen and carbon monoxide gas formed for the production of hydrocarbons by the Fischer-Tropsch reaction under elevated pressures, or in ammonia synthesis, or synthesis of methanol or isobutanol."

Representative claims are 1 and 8:

"1. A process for reforming a low boiling hydrocarbon to produce a product containing hydrogen which comprises passing a preheated low boiling hydrocarbon and steam at a steam to methane equivalent ratio of at least 1.8:1 through a multitubular reaction zone in the presence of a nickel oxide catalyst at space velocities at standard conditions corresponding to at least 700 volumes of methane equivalent per hour per volume of catalyst at an outlet pressure of at least 50 pounds per square inch gage, maintaining the outlet temperature of said tubular reaction zone between about 1350°F. and about 1700°F. by indirect heat exchange with a burning fuel and producing an effluent gas containing hydrogen without an excessive amount of unconverted low boiling hydrocarbon.

"8. In a process for reforming methane to produce hydrogen and carbon monoxide in which steam and methane are preheated to a temperature between about 800°F. and

1. Serial No. 632,599, filed January 4, 1957.

2. Space velocity is defined in appellants' brief as follows:
"Space velocity is a measure of the amount of gas fed to the reactor in a given time. Its units are volumes of gas per volume of catalyst per hour (abbreviated as $v_g/v_c/hr$.) and it indicates the number of times in one hour that the reactor space is refilled with fresh gas. * * *"

about 1150°F. and are passed through a multitubular reaction zone in the presence of a nickel oxide supported catalyst and the outlet temperature of said reaction zone is maintained between about 1350°F. and about 1700°F. by indirect heat exchange with a burning fuel, the improvement which comprises maintaining the outlet pressure of said reaction zone at least 50 pounds per square inch gage, maintaining a steam to methane mol ratio between about 2.1:1 and about 2.6:1 and providing a residence time for the reactants corresponding to a space velocity of at least 700 volumes of methane equivalent per hour per volume of catalyst whereby an effluent gas containing hydrogen and carbon monoxide and not more than 6 mol per cent unconverted methane is produced."

The references relied on are:

Mayland   2,622,089 December 16, 1952.
Roberts, Jr. 2,625,470 January 13, 1953.

Mayland discloses a process for the manufacture of carbon monoxide and hydrogen from hydrocarbons, carbon dioxide and steam. Hydrocarbons such as natural gas, methane, ethane, propane and butane are said to be useful. He states that in conventional reforming units natural gas is passed over a reduced nickel oxide catalyst at about 1400°F. in the presence of carbon dioxide and steam, but says his invention resides "in the fact that an improved method of operation of a gas reforming unit for natural gas in the presence of steam and carbon dioxide can be effected by employing high space velocities," and that "[h]igher yields of reformed gases of high quality are obtained for any given equipment size."

Roberts also teaches the preparation of hydrogen and carbon monoxide from gaseous hydrocarbons by reacting them with carbon dioxide and water, i. e., by the catalytic reforming of methane or natural gas in a tubular reformer. He states that while the chemistry of reforming is simple and straightforward, engineering problems arise because practicable reforming reactions require very high temperatures and large quantities of heat input. He says that one way of getting additional heat to the products undergoing reaction is by preheating the feed gas, stating that it is desirable to carry out the reforming operation at maximum pressures since the feed gases are often available under substantial pressure, and also since the product gases are frequently used under pressure. The rest of Roberts is cumulative to Mayland.

The board, in affirming the examiner, stated:

"After a careful and complete consideration of all the arguments advanced by the Examiner and on behalf of appellants, we are of the view that the Examiner's rejections are without reversible error and *for the reasons stated by the Examiner, the rejections will be sustained.*" (Italics supplied).

The examiner held that Mayland discloses a supported nickel oxide catalyst, temperatures from 1100° to 2000°F., and pressures from atmospheric to 250 p. s. i. The examiner made particular reference to the fact that Mayland discloses methane, ethane, propane, along with other gases, as suitable hydrocarbons, and that a "space velocity of 400 for ethane or propane would be equal to space velocities of 800 or 1200, respectively, when expressed in terms of methane equivalents." [3]   The examiner

---

3.  Appellants' brief refers to "methane equivalent" units as follows:
   "The space velocity is expressed in terms of methane equivalent because the higher molecular weight gases behave as if they were actually methane in multiple amounts. Thus, one volume of methane at standard conditions requires one volume of steam at standard conditions to produce a mixture of carbon monoxide and hydrogen. One volume of ethane (which has two carbon atoms in its molecule) requires two volumes of steam to produce a mixture of carbon monoxide and hydrogen. The reforming of one volume of ethane requires about twice as

concluded his evaluation of the Mayland reference with the statement:

" * * * At best, applicants are merely operating their process within the patentee's disclosed reaction conditions and such a method of operation would not involve invention. Applicants' recited pressures are not considered to be critical to their process, note page 3 of the specification which discloses the process may be operated at about 25 p. s. i."

The examiner rejected the claims as "substantially met by" Mayland. That terminology as employed by the Patent Office is equivalent to "unpatentable over."[4] Consequently, we take it that the rejection is based on "obviousness" within the meaning of 35 U.S.C. § 103. Since the process itself is admittedly old, the issue is whether the reaction conditions recited in the claims, and upon which patentability is predicated, would be obvious to one of ordinary skill in view of the teachings of the prior art. More specifically, the question is whether the combination of pressure above 50 p. s. i. and space velocity at standard conditions of at least 700 volumes of methane equivalent per hour per volume of catalyst are fairly suggested by the prior art.

Appellants argue first that their "essential feature of novelty is in a combination of an extraordinarily high space velocity and an extraordinarily high pressure." Their second argument is that Mayland fails to disclose hydrocarbon space velocities in excess of 400 $v_g/v_c$/hr. at standard conditions, since the higher space velocities disclosed, 200 to 1000, are not based on hydrocarbons alone, as are appellants', but on total reactants.

In considering the latter argument first, we note that Mayland makes the following remarks germane to the space velocities he contemplates using:

" * * * I have found that by using a high space velocity of the feed gases, which comprises hydrocarbon, carbon dioxide and water, through the reforming unit, that I can produce a given mol ratio of hydrogen to carbon monoxide utilizing less than the theoretical concentration of carbon dioxide. This is particularly true when using a high mol ratio of water with hydrocarbon in the feed. At about 1400°F. reforming temperature this advantage was noted for space velocities up to about 400, *the space velocity being defined as the cubic feet of gaseous hydrocarbons in the feed, measured at 70°F. and one atmosphere pressure per volume of catalyst per hour.* * * *

* * * * * *

" * * * *As to space velocity, I may employ a space velocity of the reactants through the reaction zone from about 200 to about 1000, or higher.* The upper limit of space velocity is set by the lowest practicable conversion per pass for any given application, using hydrocarbon, steam and $CO_2$. The upper

---

much endothermic heat to be supplied as the reforming of one volume of methane. One volume of ethane behaves as if it were two volumes of methane * * *."

4. The second edition of the Manuel of Patent Examining Procedure was in effect at the time the examiner made the instant rejection. Section 707.07(d) thereof instructs an examiner to use the following language when rejecting over a reference which fails to *fully anticipate* the claim:
"707.07(d) Language To Be Used In Rejecting Claims
* * * * *
"(2) If the claim is met in substance in the reference, but has immaterial variations thereover or involves mechanical equivalents, the claim should be rejected as
"(a) substantially met by, or
"(b) lacking invention over, or
"(c) unpatentable over, or
"(d) finding its full equivalent in, (or other equivalent expression)
the reference. Such rejection should be accompanied by a statement taking note of that feature or those features of the claim which are not fully met in the reference and pointing out why said feature or features do not render the claim patentable."

limit of space velocity also depends upon the specific apparatus used, catalyst employed and the desired extent of conversion. *In some cases, particularly when operation is conducted at very high temperatures in the presence of a very active catalyst, the space velocity may be as high as 1000 or even higher.*

\* \* \* \* \* \*

"My invention resides in the fact that an improved method of operation of a gas reforming unit for *natural gas in the presence of steam and carbon dioxide can be effected* by employing high space velocities. *Higher yields* of reformed gases of *high quality* are obtained for any given equipment size. \* \* \*" (Italics supplied).

We do not find appellants' arguments persuasive. We find nothing patentable in operating an old process so as to improve the capacity of the equipment through which it is run by pushing as much material through it, in any given time, as is practically feasible. That, in essence, is all that appellants have done by use of high space velocity and pressure. We think such an expedient would be obvious to one skilled in the art.

Mayland teaches that a space velocity of 400 cubic feet of *gaseous hydrocarbons* at standard conditions may be employed. Clearly, that language means *any* of the hydrocarbons within the patentee's disclosure, such as methane, ethane, or propane, i. e., 400 methane, 400 ethane, or 400 propane may be used. Therefore, if 400 volumes of ethane or propane /v$_c$/hr. are used, and if those velocities are expressed in units of "methane equivalent" volume /v$_c$/hr. the units employed by appellants in their claims, the space velocity of ethane would be 800 volumes of methane equivalent /v$_c$/hr. and the space velocity of propane would be 1200 volumes of methane equivalent /v$_c$/hr. Hence we agree with the examiner that space velocities such as claimed are taught by the reference.

We find further support for our conclusion from other statements in the Mayland patent. Mayland states that at about a 1400°F. reforming temperature, space velocities of up to 400 may be used. The patentee clearly defines the units which are to accompany the number 400 by stating, "the space velocity being defined as the cubic feet of gaseous hydrocarbons in the feed, measured at 70°F. and one atmosphere pressure, per volume of catalyst per hour." There appears to be no disagreement with that much of the disclosure. It is the statement "As to space velocity, I may employ a space velocity of the reactants through the reaction zone from about 200 to about 1000, or higher" on which there is disagreement. Appellants contend that the patentee refers to total reactants and that the examiner so conceded. The examiner stated in his Answer, "The patentee employs gaseous hydrocarbon space velocities of 400 and space velocities for the total reactants from 200 to about 1000." We do not consider that statement to be an explicit finding of a fact material to the rejection, but merely a part of the general description of the reference. Thus, while the examiner may have yielded to appellants' arguments with respect to a particular portion of the reference, he nevertheless rejected the claims as unpatentable over it. While we agree with the basis of the rejection, we do not agree with the examiner's interpretation of the statement in the patent, which in any event, is not binding on this court. See In re Reid, 179 F.2d 998, 37 CCPA 884.

It seems to us that the examiner's description of the reference is erroneous and that the *reactants* referred to are the various *hydrocarbons* which may be used. We think that if a change in units for space velocity had been intended, the patentee would have said so, and that in the absence thereof, no change in units was intended from those set forth for space velocity earlier in the disclosure. The same units seem to be intended in the last sentence of the same quoted para-

graph which states that, "at very high temperatures in the presence of a very active catalyst, the space velocity may be as high as 1000 *or even higher*." (Italics supplied).

The above interpretation renders the entire disclosure of the reference consistent. Appellants would read an inconsistency in the use of units into the reference which we are not inclined to do where, as here, a consistent use of units seems clear.

The additional statements made by Mayland indicate that the upper limit of space velocity is a mere matter of choice depending upon "the specific apparatus used, catalyst employed and the desired extent of conversion." Appellants appear to have done no more than follow the teaching of the art in using pressures and space velocities as high as practicable for their purposes.

As to the use of the combination of high pressure with high space velocity, there can be no doubt that Mayland suggests the combined use of pressures and space velocities as high as those claimed by appellants. He states, "The operating conditions for carrying out my improved process may vary considerably. * * * The pressure employed may vary from about atmospheric up to 250 pounds per square inch or higher, * * *." That statement is followed by a discussion of the space velocities he employs. Clearly there is a disclosure of pressures above 50 pounds per square inch. With regard to the use of such pressures in combination with the disclosed space velocities, the board stated:

"* * * * we find no statement * * * which would lead one skilled in the art to the conclusion that the combined high pressures and high space velocity should not be employed together. Mayland points out that the conditions of temperature, pressure, and space velocity may vary considerably, and, in our opinion, this would suggest the combination to one skilled in the art."

We agree with the examiner and board that the teachings of the prior art would have made appellants' process obvious to one of ordinary skill in this art at the time the invention was made.

The decision is affirmed.

Affirmed.

MARTIN, Judge, did not participate in this decision.